**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **ROGELIO PEDROZA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-06-CV-00051-KC** |
| | § | |
| **AUTOZONE, INC.,** | § | |
| | § | |
| **Defendant**. | § | |

**ORDER**

On this day, the Court considered Defendant Autozone, Inc.'s "Motion for Summary Judgment" ("Motion"). For the reasons outlined below, the Court hereby **GRANTS** the Motion.

**I.     BACKGROUND**

The following derives from Defendant Autozone, Inc.'s Proposed Undisputed Facts, "Plaintiff's Response to Defendant's Motion for Summary Judgment" ("Response"), and the various depositions attached to the Summary Judgment pleadings.[1]

Plaintiff Rogelio Pedroza ("Pedroza") began his employment with Defendant Autozone Inc. ("Autozone") on August 27, 1996. Def.'s Proposed Undisputed Facts ("Def.'s Facts") ¶ 2; Pedroza Dep. 34:1-7, Jul. 25, 2007. Pedroza began his tenure with Autozone as a salesperson, wherein he performed a number of duties related to sales and customer support. Def.'s Facts ¶¶ 2-3; Pedroza Dep. 34:16-18.

---

[1]     Because the Court *did not* rely upon Plaintiff's Statement of Relevant Facts in drafting this Order, Defendant's "Objections to Plaintiff's Appendix to His Response to Defendant's Motion for Summary Judgment" (Doc. No. 43) is hereby **DENIED** as **MOOT**.

As an Autozone salesperson, Pedroza was required to assist customers both at their cars in the parking lot and inside the store.   Def.'s Facts ¶ 3; Pedroza Dep. 45:15-18.  Inside the store, Pedroza's duties included greeting customers, assisting customers with looking up parts, and retrieving parts that could sometimes weigh in excess of fifty (50) pounds.  Def.'s Facts ¶¶ 3-4; Pedroza Dep. 55:16-56:14.  Additionally, Pedroza was required to stock shelves[2] and clean the store's bathrooms and floors.  Pedroza Dep. 64:17-20.  Generally, his job duties required him to bend over, stoop, climb ladders, and twist frequently, while also requiring him to stand nearly the entire time he was working.  *Id.* at 58:5-20.

Outside the store, Autozone also required employees to perform duties under their "Gotcha" service policy.  *Id.* at 56:20-22.  Under this policy, Pedroza was required to carry items, sometimes weighing up to fifty (50) pounds, to the cars of customers.  *Id.* at 56:12-19.  Salespersons, like Pedroza, were also tasked with installing wiper blades[3] and batteries in the vehicles of customers.  *Id.* at 56:20-23.  In addition, Pedroza was required to test customers' alternators and starters.  *Id.* at 56:24-57:2.

By Pedroza's account, he served at least part of his time as an Autozone salesperson as both a "sales[person] and driver."  *Id.* at 40:5.  In his own words, "[w]hen I was not driving, I would take care of customers on the counter."  *Id.* at 40:7-8.  On May 6, 1998, while serving in his capacity as an Autozone driver, Pedroza was rear-ended at a stoplight.  *Id.* at 40:9-11; Def.'s Facts ¶ 3.  As a result of the accident, he suffered injuries to his lower back and shoulder.  Pedroza Dep. 40:12-17.  Specifically, Pedroza was diagnosed with a herniated disc in the lumbar

---

[2]     Def.'s Facts ¶ 3; Pedroza Dep. 57:22-58:2.

[3]     Pedroza Dep. 58:3-4.

spine and a sprain or tear of the left rotator cuff.  Def.'s Facts ¶ 7; Reeves Dep. 40:16-17, May 11, 2007.

Pedroza spent seven months away from work to recuperate from his May 1998 injury. Def.'s Facts ¶ 7.  Before his return in November 1998, his physician placed a number of restrictions on how he could perform his duties at Autozone.  Def.'s Facts ¶ 8.  These included (1) occasionally lifting a maximum of 15 pounds above the shoulders or from below the knees; (2) occasionally climbing, squatting, kneeling and crawling; (3) no twisting his upper body; (4) alternating sitting and standing every thirty minutes; (5) standing no longer than four hours per day;  and (6) working no longer than eight hours per day.  Reeves Dep. Ex. 2.[4]

On October 22, 1999, Pedroza suffered a second workplace injury while stocking the store shelves with antifreeze.  Def.'s Facts ¶ 9.  After being relieved of his duties at the cash register by Joe Villasana and tasked with helping to unload an incoming truck, Pedroza proceeded to unload a pallet of antifreeze, two bottles at a time, while twisting to place the bottles on the shelves.  Pedroza Dep. 52:2-6.  As a result, he injured his mid-back, resulting in his T6 and T7 vertebrae being crushed by compression fractures.  Def.'s Facts ¶ 9;  Pedroza Dep. 52:24-53:4. Pedroza continued to work, however, for four more months.  Pedroza Dep. 54:2-9.  Based upon the restrictions that accompanied his injury and his inability to perform his job functions, Autozone took Pedroza off the job from February to August of 2000.  *Id.* at 54:10-55:8.  After approximately eight months away from the workplace, Pedroza returned to work

---

[4]     In his deposition testimony, Pedroza recalls his only restriction being a fifteen or twenty minute break after three or four hours standing.  Pedroza Dep. 41:23-42:3. In opposition, Autozone proffers the "Return to Work Medical Authorization Form," signed by Dr. Reeves, which confirms its account.

with the same physical restrictions as before.  *Id.* at 59:7-60:13.

Pedroza reports that after returning to work in August of 2000, he resumed his regular service functions and was able to perform his job.  *Id.* at 61:7-62:7.  Although he recalls asking for accommodations upon his return, Pedroza contends that neither his manager, Phil Ortega, nor his assistant manager accepted his request.  *Id.* at 62:8-16.  By his own account, however, Pedroza asked only for a fifteen-minute break every two to three hours.  *Id.* at 62:19-63:8.  Irrespective of what drove him to resume his full duties, the record reflects that he did continue to violate his own physician's job restrictions by continuing to bend, stoop, and lift more than fifty (50) pounds.  Def.'s Facts ¶ 10; Pedroza Dep. 61:13-62:7.

Attempting to perform an Autozone salesperson's full range of duties while under the limitations of his physical injuries soon led to a host of complications.  These included pain, leaving work early, taking days off, and asking co-workers for assistance with routine duties.  *Id.*; Pedroza Dep. 73:11-22.  Furthermore, these were issues that constantly plagued Pedroza.  Def.'s Facts ¶ 10; Pedroza Dep. 73:23-74:1.

On October 19, 2000, Pedroza received a "corrective action" for exceeding his lifting restrictions at work.  Def.'s Facts ¶ 12.  Autozone contends that Pedroza removed a battery, weighing approximately forty (40) pounds, from the battery rack while he was under restrictions not to life more than fifteen (15) pounds.  Def.'s Facts ¶ 12; Pedroza Dep. 68:21-25.  Pedroza offers a competing account, stating instead that a customer came in to have a battery tested, and despite his efforts to elicit help from his co-workers, when none of his colleagues would assist him, he took it upon himself to provide the customer with service.  Pedroza Dep. 69:8-70:3.  After the incident, he claims that he complained to his store manager to no avail.  *Id.* at 69:4-7.

-4-

On December 11, 2000, Pedroza received another corrective action for failing to inform his manager that he was not returning from lunch.  Def.'s Facts ¶ 13.  Pedroza counters, claiming that he informed a manager-in-training, wearing the shirt color reserved for management, that he was leaving on account of a "severe pain episode."  Pedroza Dep. 75:14-76:13.  In August of 2001, Pedroza again left work when his "pain became intolerable."  *Id.* at 81:22-82:17.

Autozone cited Pedroza for another violation of his lifting restrictions on September 17, 2001, when he again attempted to lift a battery.  Def.'s Facts ¶ 14.  The customer actually removed the battery from her vehicle, but upon doing so, she sustained burns to her left hand.  Pedroza Dep. 86:17-87:5.  Despite a co-worker's assurances that he would change the battery out in the car, when that assistance did not materialize and Pedroza had witnessed the customer burn herself, Pedroza took it upon himself to lift the battery into the cart and take it into the store for testing.  *Id.* at 86:13-89:4.  This activity resulted in Pedroza injuring his hand and remaining absent from work for three days.  Def.'s Facts ¶ 14; Pedroza Dep. 89:5-11.

Along with pain and injury, absenteeism accompanied Pedroza's continued attempts to perform the full range of his duties.  Def.'s Facts ¶ 15.  By January of 2004, when a new District Manager, Jacob Lozano ("Lozano"), had assumed responsibility for Pedroza's store, Lozano noted that Pedroza had been absent from work seven out of forty (40) days.  *Id.* ¶ 16; Pedroza Dep. 124:20-23.  Consequently, Pedroza received a corrective action for absenteeism in February of 2004.  Def.'s Facts ¶ 16.  These frequent absences also led Lozano to request an updated work release from Pedroza's physician.  *Id.* ¶ 17.

 On February 10, 2004, Dr. Reeves released Pedroza to work with essentially the same restrictions as before, with no lifting over thirty (30) to thirty-nine (39) pounds.  *Id.*;  Pedroza

Dep. 98:11-99:2.  Operating under these restrictions, Pedroza admitted that he could not perform the essential functions of his job without getting injured or having to go home because of pain. Def.'s Facts ¶ 18; Pedroza Dep. 99:3-100:19.  Therefore, in consideration of Pedroza's injury-driven absences, his continued disregard for his restrictions, and the sheer scope of his workplace limitations, Autozone concluded that he could no longer perform the essential functions of his job. Def.'s Facts ¶ 19.  As a result, Autozone informed Pedroza that it could not accommodate his restrictions until they were lessened.  *Id.*  Furthermore, Autozone placed him on Family Medical Leave Act ("FMLA") leave beginning February 19, 2004.  *Id.*; Pedroza Dep. 99:3-100:19.

On February 24, 2004, Pedroza requested that Dr. Reeves sign a work release form permitting him work with zero restrictions.  Def.'s Facts ¶ 20; Pedroza Dep. 104:10-13.  Pedroza claims that he did so after "Autozone requested the form," so that he could "feed [his] family and get back [his] hours."  Pedroza Dep. 108:9-13.  Nevertheless, based upon his six years of experience as his physician,[5] Dr. Reeves informed Pedroza that such a release was not appropriate.  Def.'s Facts ¶ 20; Pedroza Dep. 104:17-22.   In his own words, Dr. Reeves recounts:

> I was told by [Pedroza] that if he did not return to work 100 percent, he no longer had a job.  So I said, [Pedroza], if this is what you want, I will give this to you . . . . I said, [Pedroza], I do not want to do this.  And I made him sign an affidavit attesting to the fact that he knew that [I] was signing this so he could go back to work.

Reeves Dep. 74:24-75:7.

Following this visit with Dr. Reeves, Pedroza took the note releasing him from all restrictions to AutoZone, at which point Autozone returned him to full duty as a salesperson.  Pedroza Dep.

---

[5]      Reeves Dep. 37:5-9.

106:17-24.  At no point, however, did Pedroza describe to Autozone the questionable

circumstances under which the note was acquired.  *Id.* at 106:6-16.

After returning to work in late February of 2004, Pedroza continued to perform his duties

with difficulty.  Def.'s Facts ¶ 23; Pedroza Dep. 111:5-11.  Among other complications, Pedroza

could not stand ninety-nine (99) percent of the time as required by his job description, nor could

he frequently twist and stoop without aggravating his back pain.  Def.'s Facts ¶ 23; Pedroza Dep.

111:20-112:6.  Further, he continued to re-injure himself in the performance of his essential job

functions, including at least one re-injury to his back while lifting a battery that weighed over forty

(40) pounds.  Pedroza Dep. 111:12-16.  His pervasive, continuing physical limitations also led

him to leave the workplace early, and on occasion, to not come to work at all.  Def.'s Facts ¶ 23;

Pedroza Dep. 111:23-112:2.

On July 13, 2004, Pedroza gave his manager, Jimmy Martinez, a Texas Workers'

Compensation Commission ("TWCC") Work Status Report ("WSR") that restricted Pedroza

from standing, sitting, kneeling, squatting, bending, stooping, pushing, pulling, twisting, climbing

stairs and ladders, reaching, and from working more than eight hours per day.  Def.'s Facts ¶ 24;

Pedroza Dep. 131:10-132:16, Ex. 30.  More importantly, the WSR declared that all of these

restrictions were permanent.  Def.'s Facts ¶ 24; Pedroza Dep. 132:17-19.  In response, Autozone

informed Pedroza that it could not accomodate his physical restrictions.  Def.'s Facts ¶ 25.

Correspondingly, on July 23, 2004, AutoZone placed Plaintiff on an unpaid leave of absence.

Def.'s Facts ¶ 26; Pedroza Dep. 133:2-5.

Four days after being placed on leave, Pedroza revisited Dr. Reeves in the hopes of

procuring a more favorable work release.   Def.'s Facts ¶ 27.  Dr. Reeves did provide Pedroza

with another work release form on July 27, 2004, but the form contained nearly identical restrictions to the WSR that prompted Autozone to place him on involuntary leave of absence. *Id.* Dr. Reeves also diagnosed Pedroza with a fifteen (15) percent permanent physical impairment of the whole body dating back to February 2, 1999.  Pedroza Dep. Ex. 33.

On August 4, 2004, Pedroza filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that he had been discriminated against "because of disability in violation of the Americans with Diabilities Act of 1990."  Pedroza Dep. Ex. 27. Further, Pedroza declared that he had "requested to be allowed to alternately sit and stand" in addition to asking for "other accommodations as per [his] doctor's orders."  *Id.*  Nonetheless, he declared himself "fully able" to perform his job functions.  *Id.*

In August 2004, Autozone offered Pedroza a part-time Customer Service Representative ("CSR") position at a nearby store that could have comported with his permanent work restrictions.  Def.'s Facts ¶ 29.  Based upon the lower pay and diminished availability of hours, Pedroza declined the offer.  Pedroza Dep. 153:1-13.  Instead, Pedroza scheduled appointments with Dr. Reeves on February 2, February 8, and July 12, 2005, in an effort to procure a work release that would return him to work as an Autozone salesperson.  Def.'s Facts ¶ 30.  Contrary to his hopes, the work releases bore essentially the same physical restrictions as before.  *Id.* Consequently, in August of 2005, AutoZone terminated Plaintiff pursuant to company policy,[6] which mandated that no employee remain on a leave of absence for longer than one year.  Def.'s Facts ¶ 31.

_____

[6]     On January 30, 1998, Plaintiff signed Autozone's employee handbook, which Defendant represents as containing this information. Def.'s Facts ¶ 6; Pedroza Dep. Ex. 1.

Following notice of his termination, Pedroza filed a second Charge of Discrimination with the EEOC on August 19, 2005. Pedroza Dep. Ex. 39. In the action, he alleged discriminatory and retaliatory discharge in violation of the Americans with Disabilities Act of 1990 ("ADA"). *Id.* Subsequently, he received Right to Sue Letters[7] dated November 3, 2005, and January 17, 2006. Pl.'s Compl. and Demand for Jury Trial ("Pl.'s Compl.") 3.

Pedroza filed suit in United States District Court on February 2, 2006, thereby complying with EEOC guidelines which require suit to be brought within ninety (90) days of the issuance of a Right to Sue Letter. Doc. No. 1; *see* 42 U.S.C. § 2000e-16(c) (2006). Invoking the Court's federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343, Pedroza alleges that Autozone engaged in a litany of unlawful employment practices. Pl.'s Compl. 3. By his own account, Pedroza posits:

> Defendant[] [has] engaged in unlawful employment practices . . . . not limited to [1] Defendant's discharge of Rogelio Pedroza, a qualified individual with a disability, who was able to perform the essential functions of his position with or without reasonable accommodation, because of this disability which resulted from [a workplace] injury . . . . and [2] Defendant's discharge of Rogelio Pedroza based on the need to make reasonable accommodations to his possible future impairments.

*Id.*

Based upon his statutory citations, Pedroza contends that Autozone violated section 102(a) of the ADA, which prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other

---

[7]     A Right to Sue Letter is a condition precedent to filing a Title VII claim. *See* 42 U.S.C. § 2000e-5(f)(1); *Pinkard v. Pullman-Standard*, 678 F.2d 1211, 1215 (5th Cir. 1982).

terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a); Pl.'s Compl. 3.  He also

alleges that Autozone violated section 102(b)(1) of the ADA, which enjoins employers from

"limiting, segregating, or classifying a job applicant or employee in a way that adversely affects

the opportunities or status of such applicant or employee because of the disability of such

applicant or employee."  42 U.S.C. § 12112(b)(1); Pl.'s Compl. 3.  Finally, he argues that

Autozone contravened section 102(b)(5)(B) of the ADA, which proscribes denying employment

opportunities to an otherwise qualified individual with a disability when "such denial is based on

the need of such covered entity to make reasonable accommodation to the physical or mental

impairments of the employee or applicant."   42 U.S.C. § 12112(b)(5)(B); Pl.'s Compl. 3.

On August 30, 2007, Autozone filed a timely Motion for Summary Judgment with the

Court.  Doc. No. 39.  Primarily, Autozone argues that Pedroza "does not have a disability as

defined by the ADA."  Def.'s Mot. 1.  In addition, Autozone claims that the Court cannot

consider Pedroza a "qualified individual with a disability," thereby abnegating his ability to

establish his prima facie burden for a discrimination claim.  *Id.*  Alternatively, Autozone posits that

Pedroza could not "meet his ultimate burden to show that his discharge was a pretext for

intentional disability discrimination."  *Id.*  Under either theory, Autozone requests that the Court

dismiss Pedroza's claim, with prejudice, and at his cost.  *Id.*          .

## II.    DISCUSSION

### A.    Standard

Summary judgment is required "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c) (2007); *see also Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006).  The substantive law identifies which facts are material.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248,(1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Ellison*, 85 F.3d at 189.

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact ." *Celotex*, 477 U.S. at 323; *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046-1047 (5th Cir. 1996).  If the moving party meets its initial burden, the nonmoving party "must – by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e).  The nonmovant's burden may not be satisfied by "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."  *Warfield*, 436 F.3d at 557 (quoting *Freeman v. Texas Dep't of Crim. Justice*, 369 F.3d 854, 860 (5th Cir. 2004)).  Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  Thus, the ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

## B.     Workplace Discrimination

The Fifth Circuit analyzes discrimination claims brought pursuant to the ADA using the

*McDonnell Douglas* framework.  *See McDonnell Douglas v. Green*, 411 U.S. 792, 802-04

(1973); *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995).  Under this framework,

a plaintiff establishes a prima facie case of discrimination if he can prove that: (1) plaintiff was

discharged, (2) plaintiff was qualified for the position, (3) plaintiff was within a protected class,

and (4) plaintiff was either replaced by someone outside the protected class or otherwise

discharged because of the protected trait.  *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 309 (5th

Cir. 2004) (citing *Palosta v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5th Cir. 2003)).  If the

plaintiff makes this initial showing, a presumption of discrimination arises.  *See Tex. Dep't. of*

*Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  The burden then shifts to the defendant

to rebut this presumption by articulating a legitimate, non-discriminatory reason for the

termination.  *Burdine*, 450 U.S. at 252-53; *Rachid*, 376 F.3d at 312.  If the defendant meets this

burden of production, the plaintiff must then offer evidence sufficient to create a genuine issue of

material fact as to whether the defendant's articulated reason is either (1) a mere pretext for

discrimination or (2) one reason for the decision, but discrimination was nevertheless the

"motivating factor" for the decision.  *Burdine*, 450 U.S. at 256; *Rachid*, 376 F.3d at 312.

### 1.    Pedroza's claim of disability under the ADA

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual with

a disability because of the disability of such individual in regard to job application procedures, the

hiring, advancement, or discharge of employees, employee compensation, job training, and other

terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  Absent direct evidence

of discrimination, to establish a claim for discrimination under the ADA, a plaintiff must satisfy

the standard of proof set forth for Title VII actions in *McDonnell Douglas*.  *See McDonnell*

*Douglas*, 411 U.S. at 802; *Daigle*, 70 F.3d at 396.  Therefore, where a plaintiff can offer no direct evidence of discrimination, he may only carry a disability discrimination suit by proving that: (1) he suffers from a disability; (2) he is qualified for the job; (3) he was subject to an adverse employment action; and (4) he was replaced by a non-disabled person or was treated less favorably than non-disabled employees.  *Daigle*, 70 F.3d at 396.

The *sine qua non* of an ADA claim is that the plaintiff is a qualified individual with a disability.  *See Turco v. Hoechst Celansese Corp.*, 101 F.3d 1090, 1092 (5th Cir. 1996) (per curiam).  The ADA defines disability as (1) a physical or mental impairment that substantially *limits one or more major life activities* of an individual, (2) a record of such an impairment, or (3) being regarded as having such an impairment.  42 U.S.C. § 12102(2) (emphasis added).  In all cases, the impairment must substantially limit one or more major life activities of the individual. *See Bridges v. City of Bossier*, 92 F.3d 329, 332 (5th Cir. 1996).

The majority of Pedroza's impairments do not qualify as a disability as that term is defined under the ADA.  To be considered a disability, an injury or impairment "must substantially limit a major life activity."  *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995).  Put another way, "neither the Supreme Court nor [the Fifth Circuit] has recognized the concept of a per se disability under the ADA, no matter how serious the impairment; the plaintiff still must adduce evidence of an impairment that has actually and substantially limited the major life activity on which he relies."  *Waldrip v. General Elec. Co.*, 325 F.3d 652, 656 (5th Cir. 2003).  Thus, to defeat summary judgment, Pedroza must proffer evidence showing that he "(1) [has] a mental or physical impairment that (2) substantially limits (3) a major life activity."  *Dupre*, 242 F.3d at 613. The ADA does not define either "substantially limits" or "major life activity," but the EEOC has

-13-

promulgated regulations under the ADA that define those terms.  As to the former, federal regulations define substantially limited as "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to . . . . the average person in the general population . . . ."  29 C.F.R. § 1630.2(j)(1) (2006).  Federal guidelines also individuate major life activities as functions including "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working,"[8] while also including sitting, standing, lifting, and reaching.  29 C.F.R. App. § 1630.2(i).

In his Response to Autozone's Motion for Summary Judgment, Pedroza declares himself substantially impaired in the following life activities: (1) sitting and standing; (2) lifting and reaching; (3) sexual activity; (4) kneeling; (5) sleeping; (6) restroom usage; and (7) exercising. Pl.'s Resp. 2.  The Court will address each of these activities in turn.

### a.    Sitting and standing

In the instant case, Pedroza claims that the limitation on his ability to sit and stand constitutes a substantial limitation of a major life activity.  *Id.* at 2.  Under Fifth Circuit precedent, sitting and standing have indeed been recognized as major life activities for the purpose of the ADA.  *Dutcher*, 53 F.3d at 725.  To support his claim, Pedroza alleges that he is "restricted in his ability to stand for more than a few hours," that he "should alternate between sitting and standing at regular intervals," and that he "cannot sit for more than three or four hours without feeling pain."  *Id.*  Further, his most recent work release form, signed by Dr. Reeves on July 12, 2005, does indicate that Pedroza should alternate sitting and standing every four (4) hours and limit standing to four (4) hours per day.  Pedroza Dep. Ex. 37.

---

[8]        29 C.F.R. § 1630.2(i) (2007).

The Code of Federal Regulations describes "substantial limitation" as that which leaves an individual:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
> ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity *as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity*.

29 C.F.R. § 1630.2(j)(1) (emphasis added).

Thus, the Court must examine whether the limitation of standing only four (4) hours per day, alternating standing and sitting every four (4) hours, and not being able to sit more than three (3) or four (4) hours without pain constitutes a significant restriction when juxtaposed to the manner in which the average person can participate in the same activities. *See id.* To formulate its finding, the Court finds the extant case law instructive.

In *Dupre v. Charter Behavioral Health System of Lafayette, Inc.*, the Fifth Circuit analyzed whether the plaintiff's restrictions of having to rise from sitting every hour and walk around and having to walk or sit for a while for every hour she stood represented a substantial limitation of a major life activity. *Dupre v. Charter Behavioral Sys. Of Lafayette, Inc.*, 242 F.3d 610, 614 (5th Cir. 2001). To reach its conclusion, the Fifth Circuit looked to holdings from its sister circuits. Namely, the *Dupre* court cited to a Second Circuit opinion which held that police officers who had difficulty standing for any period of time, and who had to move around after sitting for too long, did not present "sufficiently substantial" impairments "as compared with the average person's ability." *Id.* (quoting *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 644 (2d Cir. 1998)). Additionally, the *Dupre* court looked to a Third Circuit case where an employee was claiming disability based on his need to take breaks every hour from standing. *Id.* (citing

*Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 186 (3d Cir. 1999)).  The Third Circuit reasoned:

> Because Taylor can stand and walk for fifty minutes at a time, and can
> continue for longer periods if he takes a break every hour, he can carry out
> most regular activities that require standing and walking, even though he
> may not be able to perform Pathmark's jobs without accommodation.  We
> conclude that his ability to walk and stand is not significantly less than
> that of an average person.

*Taylor*, 177 F.3d at 187-188.

Drawing on the guidance of these rulings, the Fifth Circuit held that "Dupre's ability to sit or stand

in one place for up to one hour at a time before having to walk around makes clear that the

'condition, manner, or duration' under which she was able to sit or stand was not significantly

restricted as compared with the average person."  *Dupre*, 242 F.3d at 614.  Ergo, the Fifth Circuit

found that the restrictions of (1) having to rise from sitting every hour and walk around and (2)

having to walk or sit for a while for every hour spent standing *did not* substantially limit "the

major life activities of standing and sitting."  *Id.*

In *Jenkins v. Cleco Power, LLC,* the Fifth Circuit analyzed a case where a plaintiff claimed

that his leg injury resulted in restrictions which substantially limited his ability to climb, walk, and

sit.  *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007).  In that case, the plaintiff

was climbing a utility pole when it broke, causing him to fall to the ground and fracture his left

femur.  *Id.* at 311.  The comminuted fracture required extensive surgery and resulted in some

permanent deformity to the plaintiff's leg, difficulty with motion and weight bearing, locking of

his leg, and limitations to his physical capacity to perform several job-related tasks, including the

ability to sit for extended periods.  *Id.* at 311-12.  At trial, the parties presented evidence that the

plaintiff could, with intermittent breaks, only sit for up to three hours a day.  *Id.* at 312.

Moreover, testimony emerged to demonstrate that the plaintiff's sitting during his computer

training was difficult and that others noticed his discomfort.  *Id.*  Based upon these facts, the Fifth Circuit held that "[b]ecause over the course of the day Jenkins' ability to sit is significantly more restricted than the average person, [] the court clearly erred in finding that Jenkins is not disabled within the meaning of the ADA."  *Id.* (internal citations omitted).

Based upon these precedents, the Court finds that Pedroza is not disabled on account of his standing and sitting restrictions.  Although the court sympathizes with those who, like Pedroza, suffer from long-term pain, the Court reaches this conclusion for two reasons.  First, the limitation of Pedroza's standing to only four hours per day, and alternating standing and sitting every four hours, is significantly less stringent than the restriction in *Dupre*, where the plaintiff had to walk or sit *for a while* after *every* hour that the plaintiff spent standing.  *Dupre*, 242 F.3d at 614.  If the Fifth Circuit found that the restriction in *Dupre* did not embody a substantial limitation under the ADA, then Pedroza's restrictions must also fail.  *See id.*

Secondly, Pedroza's sitting impairment, which he describes as causing him pain when he sits three to four hours, represents far less of a restriction than that which the Fifth Circuit has pronounced as significant.  Pl.'s Resp. 2; Pl.'s Decl. ¶ 11.[9]  More importantly, the record demonstrates that Pedroza never complained of his inability to sit, but rather, consistently reiterated that the only accommodation he needed at work was a fifteen-minute break *from*

---

[9]     As of Pedroza's most recent work release form, Dr. Reeves suggested that he alternate sitting and standing every four hours.  Pedroza Dep. Ex. 37.  This restriction, however, has lessened through the course of Pedroza's visits to Dr. Reeves.  On February 10, 2004, when Pedroza was taking pain medication, which cause vertigo, Dr. Reeves suggested that he alternate sitting and standing every forty-five (45) minutes.  *Id.* at Ex. 25.  On July 27, 2004, and February 8, 2005, Dr. Reeves recommended that Pedroza alternate sitting and standing every two hours.  *Id.* at Ex. 31, 35.  By July of 2005, Dr. Reeves had eased this restriction to every four hours.  *Id.* at Ex. 37.

*standing* every two to three hours.  *Id.* at 62:19-63:8.  This differs significantly from the evidence

in *Jenkins*, where the plaintiff could only sit *up to* three hours a day, which multiple sources were

able to corroborate.  *Jenkins*, 487 F.3d at 315.  Further, when taken alongside the Fifth Circuit's

denial of disability status to the plaintiff in *Dupre*, who had to rise from sitting every hour and

walk around, Pedroza's restrictions fall short of the substantial limitation threshold necessary to

invoke the protections of the ADA.  *See Dupre*, 242 F.3d at 614.  Because Pedroza has not

demonstrated that his back injury leaves him unable to stand or sit, or that he is "significantly

restricted . . . . as compared to the condition, manner, or duration under which the average

person" can do so, his standing and sitting restriction do not qualify as substantial limitations on a

major life activity for purposes of the ADA.  *See* 29 C.F.R. § 1630.2(j)(1).

### b.    Lifting and reaching

Next, the Court must ascertain whether the limitations on Pedroza's ability to lift and

reach substantially affect a major life function.  Along with sitting and standing, the Fifth Circuit

has held that lifting and reaching constitute major life activities.  *Dutcher*, 53 F.3d at 725 n.7.

Therefore, when a plaintiff claims substantial limitation of his ability to reach and lift, the

reviewing court must examine how the plaintiff can perform these functions in the context of the

normal activities of daily living.  *See  Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1120 (5th Cir.

1998) (citations omitted).  To provide an analytical backdrop, Pedroza states that he is not able to

lift his daughter.[10]  Pl.'s Resp. 2; Pl.'s Decl. ¶ 11.  Additionally, Pedroza's most recent work

release form, dated July 12, 2005, appropriates to Pedroza a thirty (30) to thirty-nine (39) pound

---

[10]    Autozone emphasizes that Pedroza's daughter is eleven (11) years old.  Def.'s
Reply 3.

lifting restriction.[11]  Pedroza Dep. Ex. 37.  As to the reaching limitation, Pedroza states only that

he is "restricted in the amount of time he may spend lifting and reaching."  Pl.'s Resp. 2.  His

work release form of July 2005 supports this notion, stating that Pedroza may only lift

above the shoulders and from below the knees occasionally.  Pedroza Dep. Ex. 37.

Based upon the evidence adduced, Pedroza fails to demonstrate that he is substantially

limited in his ability to lift or reach.  In making this finding, the Court follows Fifth Circuit case

law regarding what constitutes a substantial impairment or restriction to the major life activity of

lifting.  *See, e.g.*, *Pryor v. Trane Co.*, 138 F.3d 1024, 1027 (5th Cir. 1998) (finding that a

plaintiff's substandard ability to lift from shoulder to overhead did not constitute a substantial

limitation of a major life activity).  In *Dutcher*, the plaintiff presented evidence that she could "do

lifting and reaching as long as she avoid[ed] heavy lifting and repetitive rotational movements."

*Dutcher*, 53 F.3d at 726.  Further, the plaintiff in *Dutcher* testified that she "[had] trouble picking

up little things from the floor" and "holding things up high or real tight for long periods of time."

*Id.* at 726 n.11.  After analyzing this evidence, the Fifth Circuit held that as a matter of law, "a

jury could not find that her impairment substantially limits life activities on this basis."  *Id.*

In *Ray v. Glidden*, the Fifth Circuit held that an ADA plaintiff was not substantially limited

in a major life activity when he could not lift heavy objects and his physician had recommended

that he be limited to lifting objects weighing from five to ten (10) pounds.  *Ray v. Glidden*, 85

---

[11]     This restriction has also varied during the course of Pedroza's visits to Dr. Reeves.
On February 10, 2004, Dr. Reeves limited him to lifting thirty (30) to thirty-nine
(39) pounds.  Pedroza Dep. Ex. 25.  On July 27, 2004, Dr. Reeves limited Pedroza
to lifting forty (40) to fifty (50) pounds.  *Id.* at Ex. 31.  Later, on Febraury 8,
2005, Dr. Reeves recommended that Pedroza not lift more than twenty-five (25)
pounds.  *Id.* at Ex. 35.  By July of 2005, Dr. Reeves had raised the lifting
restriction back to thirty (30) to thirty-nine (39) pounds.  *Id.* at Ex. 37.

F.3d 227, 229 (5th Cir. 1996).  The Fifth Circuit reasoned that "[t]o determine whether a person

is substantially limited in a major life activity other than working, we look to whether that person

can perform the normal activities of daily living."  *Id.* (citations omitted).  The court found that

the plaintiff was not substantially limited because he "c[ould] lift and reach as long as he avoid[ed]

heavy lifting."  *Id.*  More importantly, a number of Fifth Circuit cases reinforce this holding.[12]

*See, e.g., Shannon v. Henderson*, No. 01-10346, 2001 WL 1223633, at *8 (5th Cir. Sept. 25,

2001) (holding that a plaintiff who could not lift items over twenty (20) pounds was not

substantially limited); *Moody v. M.W. Kellogg Co.*, No. 98-20757, 1999 WL 153032, at *3 (5th

Cir. Mar. 8, 1999) (holding that a plaintiff who could not lift objects over ten (10) pounds was not

substantially limited).

Pedroza premises his lifting and reaching disability on being restricted to lifting no more

than thirty (30) to thirty-nine (39) pounds and on being limited from frequent reaching and lifting

above his head or below his knees.  Pl.'s Resp. 2; Pedroza Dep. Ex. 37.  Based upon the existing

case law, however, these restrictions fail to reach the required level of significance.  Indeed, the

Fifth Circuit has found that a ten (10) pound lifting restriction did not represent a substantial

limitation.  *Moody*, 1999 WL 153032, at *3.  Clearly, then, Pedroza's thirty (30) to thirty-nine

(39) pound lifting restriction cannot constitute a substantial limitation.  Similarly, Pedroza's

---

[12]     Other circuit courts have also issued complimentary holdings to the instant Order.
In *Williams v. Channel Master Satellite Sys., Inc.*, the Fourth Circuit held that "as
a matter of law . . . . a twenty-five pound lifting limitation . . . . does not constitute
a significant restriction on one's ability to lift, work, or perform any other major
life activity."  *Williams v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346 (4th
Cir. 1996).  Additionally, the Eight Circuit held in *Aucutt v. Six Flags Over Mid-
America* that a twenty-five (25) pound lifting restriction was not a significant
restriction on a major life activity.  *Aucutt v. Six Flags Over Mid-America*, 85 F.3d
1311, 1319 (8th Cir. 1996).

reaching restriction falls short of qualifying him as disabled.  Under Fifth Circuit precedent, both

the inability to reach and lift above a plaintiff's shoulders and the inability to reach and pick things

up from the floor have been held not be substantial limitations.  *See Pryor,* 138 F.3d at 1027;

*Dutcher*, 53 F.3d at 726.  These scenarios are not inapposite to the instant case.  Hence,

Pedroza's restrictions do not evince that he is "significantly restricted . . . . as compared to the

condition, manner, or duration under which the average person" can lift or reach, and as such, his

reaching and lifting restrictions do not meet the definition of substantial limitations on a major life

activity for purposes of the ADA.  *See* 29 C.F.R. § 1630.2(j)(1).

### c.       Sexual activity

Pedroza also posits that his injuries have impaired his ability to engage in the major life

function of sexual activity.  Pl.'s Resp. 2.  Although courts, including the Supreme Court, have

held that sexual activity is a major life activity as it relates to reproduction, Fifth Circuit case law

has yet to conclusively pronounce whether sexual activity in general qualifies as a major life

activity.  *See Bragdon v. Abbott*, 524 U.S. 624, 638 (1998) (finding that reproduction and the

sexual dynamics associated with it are major life activities); *see also Bear v. Exxon Mobil Corp.*,

No. 03-798, 2004 WL 2603727, at *7 (E.D. La. Nov. 15, 2004) (finding that *non-reproductive*

sexual activity constituted a major life function for purposes of the ADA); *White v. Bank of*

*America Corp.*, No. 99-2329, 2000 WL 1664162, at *4 (N.D. Tex. Nov. 2, 2000) (holding that

plaintiff with hepatitis C was disabled because sexual activity could cause spread of infection); *but*

*see Qualls v. Lack's Stores, Inc.*, No. 98-149, 1999 WL 731758, at *2 (N.D. Tex. March 31,

1999) (finding that plaintiff with hepatitis C was not disabled because sexual intercourse is not

major life activity).  Even so, recent decisions among the federal courts indicate a growing trend

-21-

to regard sexual activity as a major life function.  *See McAlindin v. County of San Diego*, 192 F.3d 1226, 1234 (9th Cir. 1999) (holding that engaging in sexual relations, like procreation, is a major life activity); *Norden v. Samper*, 503 F. Supp. 2d 130, 151 (D.D.C. 2007) (holding that the ability to engage in sexual relations is a major life activity); *Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 295 (S.D.N.Y. 2003) (same); *Praseuth v. Newell-Rubbermaid, Inc.*, 219 F. Supp. 2d 1157, 1185 (D. Kan. 2002) (same); *Powell v. City of Pittsfield*, 221 F. Supp. 2d 119, 146 (D. Mass. 2002) (holding that courts have had little trouble finding sexual relations to be a major life activity).  Based on the weight of federal case law, this Court now joins the increasing number of courts that have found sexual relations to constitute a major life activity for purposes of the ADA.

Having established that sexual relations represents a major life activity, Pedroza must nevertheless offer evidence that his impairment substantially limits him in this major life function to qualify as disabled.  *See Bridges*, 92 F.3d 332 (5th Cir. 1996).  To meet this burden, Pedroza has supplied the Court with a physician's report indicating that he suffers "sexual problems occasioned by pain" and "loss of libido."  Reeves Dep. Ex. 17.  Thus, Pedroza's case differs from prior cases where plaintiffs' claims of sexual disability have failed as a product of a deficient proffer of evidence.  *See Watkins v. Roadway Exp. Inc.*, No. 01-10065, 2001 WL 1085103, at *3 (5th Cir. Aug. 30, 2001) (holding that the vague complaint of reduced ability to engage in sexual relations, absent medical testimony or evidence, is insufficient to permit a jury finding of disability for purposes of the ADA); *Smith v. Tuesday Morning Corp.*, No. 06-1046, 2007 WL 2851107, at *3 (N.D. Tex. Oct. 2, 2007) (holding that mere assertions of sexual disability, including the claim of more difficult and less frequent intimacy, without corroborating evidence, are insufficient to

create a material fact issue).  Moreover, because Pedroza has offered this medical evidence of his

sexual impairment, the Court finds that a material fact issue does exist as to whether Pedroza's

sexual impairment renders him disabled for purposes of the ADA.                        **d.**

      **Kneeling**

      Additionally, Pedroza claims that he is substantially limited in his ability to kneel.  Pl.'s

Resp. 2.  In fact, Pedroza states that "[w]hen he has tried to do it, his knees have locked and he

has needed the assistance of another person to help him get up."  *Id.*  To date, the Fifth Circuit

has yet to rule on whether the impairment of a plaintiff's ability to kneel can be considered a major

life function.  Several other courts, however, have addressed this issue and answered in the

negative.  *See Gretillat v. Care Initiatives*, 481 F.3d 649, 654 (8th Cir. 2007) (holding that

crawling, kneeling, crouching, and squatting cannot be qualitatively characterized as major life

activities); *Hockaday v. Brownlee*, 370 F. Supp. 2d 416, 423 (holding that the abilities to lift a

certain amount of weight, crawl, kneel, squat, or climb are not major life activities); *Miller v.*

*Airborne Exp.*, No. 3: 98-CV-0217-R, 1999 WL 47242, at *4 (N.D. Tex. Jan. 22, 1999) (holding

that crawling, kneeling, squatting, and climbing were activities outside the protections of the

ADA, as they did not constitute major life activities); *Hazeldine v. Beverage Media*, *Ltd.*, 954 F.

Supp. 697, 704 (S.D.N.Y. 1997) (finding that an obese plaintiff was not substantially limited in a

major life activity because she could not kneel or bend because of her weight).  Furthermore,

while federal guidelines articulate major life activities to include "caring for oneself, performing

manual tasks, walking, seeing, hearing, speaking, breathing, learning and working,"[13] as well as

---

    [13]    29 C.F.R. § 1630.2(i).

including sitting, standing, lifting, and reaching,[14] nowhere do the federal guidelines mention kneeling.  Based upon the weight of present case law and the relevant federal regulations, this Court now joins in the growing list of opinions finding that kneeling does not constitute a major life activity.  As such, Pedroza's claim of disability premised on his inability to kneel must fail.  *See Dutcher*, 53 F.3d at 726 (holding that an injury or impairment must substantially limit a major life activity to be considered a disability).

**e.     Sleeping**

Pedroza also argues that his injuries substantially limit the major life activity of sleeping.  Pl.'s Resp. 2.  To date, the Fifth Circuit has not determined whether sleeping constitutes a major life activity.  *Carter v. Ridge*, No. 07-20275, 2007 WL 4104349, at *3 (5th Cir. Nov. 19, 2007) (per curiam).  In all ADA discrimination cases, a plaintiff must establish not only that his impairment constitutes a major life activity, but that the impairment substantially limits the activity in question.  *See Bridges*, 92 F.3d at 332.  Assuming, *arguendo*, that sleeping does represent a major life activity, the Court finds that Pedroza has not submitted a genuine issue of material fact as to whether his impairment substantially limits his ability to sleep.  A substantial limitation of a major life activity is one which "significantly restricts the duration, manner, or condition under which an individual can perform a particular major life activity as compared to the average person in the general population's ability to perform that same major life activity."  29 C.F.R. § 1630(j)(1).

This finding resonates with the Fifth Circuit's finding in *Carter*, where the court found that a plaintiff's sleep disturbances and inability to get more than five hours of sleep did not establish a

---

[14]     29 C.F.R. App. § 1630.2(i)

substantial impairment of sleeping.  *Carter*, 2007 WL 4104349, at *3.  In *Carter*, the Fifth Circuit

looked to an Eighth Circuit holding that sleeping two and a half hours at a time and five hours a

night did not represent a substantial impairment,[15] and to a Sixth Circuit holding that five (5)

hours of sleep "is not significantly restricted in comparison to the average person in the general

population."  *Id.* (quoting *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 316 (6th Cir. 2001)).

According to Pedroza, he merely cannot enjoy "more than three to four hours of uninterrupted

sleep."  Pl.'s Resp. 2.  Additionally, Pedroza has not submitted any evidence that lack of sleep has

impacted his daily life.  Therefore, in accordance with Fifth Circuit precedent and because of

Pedroza's insufficient proffer of evidence, the Court finds that Pedroza is not substantially limited

in the activity of sleeping.

### f.      Restroom usage

Pedroza also claims that his excretory system has been drastically limited by his injuries.

Pl.'s Resp. 2.  Specifically, he states that he suffers from bouts of constipation, diarrhea, and

frequent urination.  Pl.'s Sworn Decl. 3.  Pedroza, however, fails to offer any evidence or case

law to support his contention that excretory functions constitute a major life activity for purposes

of the ADA.

The Fifth Circuit has found that "a physical impairment, standing alone, is not necessarily a

disability as contemplated by the ADA."  *Dutcher*, 53 F.3d at 726.  Moreover, previous cases

within the Fifth Circuit have refused to recognize a disturbance in excretory functions as a

disability for purposes of the ADA.  In *Branch v. City of New Orleans*, the Fifth Circuit held that

a plaintiff suffering from Crohn's disease, which carries symptoms of chronic diarrhea and

---

[15]        *Nuzum v. Ozark Auto. Distribs.*, 432 F.3d 839, 848 (8th Cir. 2005).

abdominal pain, was not a qualified individual with a disability for purposes of the ADA.  *Branch v. City of New Orleans*, No. 95-30526, 1996 WL 60610, at *4 (5th Cir. Jan. 31, 1996); *see also Hall v. Principi*, No. L-03-CV-90, 2006 WL 870190, at *8 (S.D. Tex. Apr. 3, 2006) (holding that irritable bowel syndrome did not constitute a physical impairment which substantially limits a major life activity).  Further, in *Rettig v. Boyd Tunica, Inc.*, a federal district court refused to consider urination a major life activity.  *Rettig v. Boyd Tunica, Inc.*, No. 98-CV-17-B-B, 1999 WL 1068604, at *4 (N.D. Miss. May 7, 1999).

Here, as in *Branch*, the Court finds that "the inconvenience" of excretory system impairments does "not rise to the level of a substantial limitation on [Pedroza's] major life activities."  *Branch*, 1996 WL 60610, at *4.  Moreover, as the court found in *Rettig*, this Court now finds that the Pedroza has not presented sufficient case law to support his contention that excretory functions represent a major life activity.  *See Rettig*, 1999 WL 1068604, at *4.  In light of these decisions and the inability of Pedroza to marshal sufficient support for his position, the Court cannot find that his impaired restroom habits constitute a major life activity for purposes of the ADA.

### g.    Exercising

Lastly, Pedroza avers that he can no longer exercise by walking, bicycle riding, and jogging.  Pl.'s Resp. 2.  In *Shannon v. Henderson*, the Fifth Circuit opined that a "number of courts have found that recreational activities do not constitute major life activities."  *Shannon*, 2001 WL 1223633, at *6 (citing *Colwell*, 158 F.3d at 642-43 (holding that golfing and mall shopping were not major life activities); *Wellner v. Town of Westport*, 154 F.Supp.2d 360, 361-62 (D. Conn. 2001) (holding that recreation and socializing are not major life activities for the

purposes of the ADA)).  Looking to these holdings, the *Shannon* court held that recreational hunting did not constitute a major life activity for purposes of the ADA.  *Id.*  Just as the *Shannon* court found that recreational hunting did not constitute a major life activity, this Court now holds that exercising does not represent a major life activity.  *See id.*; *Weber v. Strippit, Inc.*, 186 F.3d 907, 914 (8th Cir. 1999) (holding that snow shoveling, gardening, mowing the lawn, playing tennis, fishing, and hiking are not major life activities).  Accordingly, Pedroza's impaired ability to exercise by walking, biking, and jogging cannot meet the threshold of definition of disability for purposes of the ADA.

### 2.    Pedroza is not a "qualified individual" for purposes of the ADA

Having established a sufficient quantum of evidence to demonstrate a fact issue as to whether or not he was disabled within the meaning of the ADA, Pedroza nevertheless fails to meet the requirements of a "qualified individual with a disability" under the ADA.  Title I of the ADA states that: "[n]o covered entity shall discriminate *against a qualified individual with a disability* because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112 (emphasis added).  The ADA defines a qualified individual with a disability as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  If an accommodation proves necessary to carry out these functions, the plaintiff bears the burden of requesting the reasonable accommodation.  *Jenkins*, 487 F.3d at 315.  In crafting the accommodation, the ADA does not require employers to modify the duties of other employees in order to provide a

reasonable accommodation. *Magnant v. Panelmatic Tex., Inc.*, No. 05-0135, 2006 WL 2434475, at *13 (S.D. Tex. Aug. 22, 2006). Further, an employer is not required to eliminate or redistribute essential functions of a position in order to furnish an accommodation. *See Bradley v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 3 F.3d 922, 925 (5th Cir. 1993) (holding that "such redefinition exceeds reasonable accommodation").

By his own admission, Pedroza was unable to perform his job functions without accommodation from his return to work in 1998 onward. Pedroza Dep. 41:19-42:8. Even so, in his Response, Pedroza claims that he was "not only able to perform the essential duties of his position," but that from 2000 to 2004, he did so. Pl.'s Resp. 3. Likewise, in his deposition testimony, Pedroza clearly recalls that the only accommodation he ever requested of Autozone was fifteen (15) to twenty (20) minute breaks every three to four hours. *Id.* at 42:1-3. Oddly, however, Pedroza later argues in his Response that he could have continued to do his job "if he had been accommodated or his job functions were modified." Pl.'s Resp. 3. He also opines that "if he had been accommodated with a modified schedule or duties," he could have worked without exacerbating his back pain. *Id.* Nonetheless, Pedroza fails to articulate when, if ever, he requested any of these modifications of his schedule, job functions, or duties.

Because the plaintiff bears the burden of requesting accommodations, the law cannot recognize any allusion to duty and schedule modifications beyond those actually requested by Pedroza. *See Jenkins*, 487 F.3d at 315. As to the short breaks that Pedroza did mention, Autozone argues that such breaks would render the store under-staffed and unable to meet its standards for customer service. Def.'s Reply 3-4. More importantly, Pedroza fails to delineate how these short breaks would act to obviate his recurrent need to leave work early or take days

-28-

off on account of pain, or how it would alter his need to have co-workers assist him with routine duties.  Pedroza Dep. 73:11-22.  Perhaps most importantly, Pedroza fails to address how these short breaks, as workplace accommodations, would prevent the types of injuries he suffered in October of 2000 or September of 2001 while carrying out the common duties of an Autozone salesperson.[16]

To bolster his case, Pedroza recounts that he now works at Checkers Auto Parts ("Checkers"), one of Autozone's competitors.  Pl.'s Resp. 5.  Pedroza argues that his position and duties at Checkers mirror those he had at Autozone, and moreover, he states that the labor model at Autozone and Checkers is the same.  *Id.*  According to Pedroza, Checkers accommodates his restrictions by according him breaks every couple of hours, permitting him to alternate between sitting and standing, and not requiring him to lift beyond his restrictions.  *Id.*  Based upon these facts, Pedroza believes that a reasonable jury could conclude that Autozone could have accommodated his restrictions.  *Id.* at 6.

Pedroza, however, has not convinced this Court that the short breaks he requested would allow him to perform the duties of an *Autozone* salesperson, including lifting batteries, stocking shelves, standing ninety-nine (99) percent of the day, twisting, stooping, and lifting from above his head.  *See* Def.'s Reply 4.  In fact, each of these duties patently contravenes his physician's restrictions.  *Id.*  Rather than assume that the accommodations crafted by Checkers would be possible at Autozone, the Court remains mindful that the determination of a reasonable

---

[16] Pedroza was injured in October 1999 while stocking shelves with antifreeze.  Def.'s Facts ¶ 9.  He was also injured in September 2001 while lifting a battery onto a cart.  *Id.* ¶ 17.  Both of these activities represented routine activities of an Autozone salesperson.

accommodation "must be made in light of the circumstances surrounding a given case."

*Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 735-36 (5th Cir. 1999) (quoting *Beck v. Univ. of*

*Wisconsin Bd. of Regents*, 75 F.3d 1130, 1136 (7th Cir. 1996)).  Additionally, the Court notes

that employers need not alter or reallocate the essential functions of a position in order to furnish

an accommodation.  *See Bradley*, 3 F.3d at 925.  Furthermore, employers bear no responsibility

for creating light duty jobs to accommodate disabled employees.  *Foreman v. The Babcock and*

*Wilcox Co.*, 117 F.3d 800, 809 (5th Cir. 1997).

   Regardless of Pedroza's current experience at Checkers, he has offered nothing to support

his contention that he could carry out the duties of an Autozone salesperson with or without

reasonable accommodations.  Pedroza maintains that with duty and schedule modifications he

could have performed the essential functions of his job.  Pl.'s Resp. 4.  Such accommodations,

however, are not required by law.  *See Bradley*, 3 F.3d at 925, *Foreman*, 117 F.3d at 809.  All the

law requires is that the employer engage in an interactive process with the employee to determine

what reasonable accommodations, if any, will allow the employee to carry out the essential

functions of his position.  *See Loulseged*, 178 F.3d at 736 (holding that when an employer's

unwillingness to engage in a good faith interactive process leads to a failure to reasonably

accommodate an employee, the employer violates the ADA).  Autozone manifested its

engagement in this process prior to 2004 by allowing Pedroza to ask co-workers for assistance,

and when possible, to only perform duties consistent with his medical restrictions.  Pedroza Dep.

73:11-74:1.  Autozone also carried out this interactive process in August of 2004 by offering

Pedroza a part-time CSR position[17] that would have comported with his permanent work restrictions.  Def.'s Facts ¶ 29.  Thus, while Autozone has met its burden of attempting to accommodate Pedroza, Pedroza has failed to demonstrate how he could have carried out the essential functions of an Autozone salesperson with or without reasonable accommodations.  In fact, his history of injuries clearly demonstrates otherwise.  For these reasons, Pedroza does not meet the definition of a qualified individual with a disability for purposes of the ADA.  As a consequence, Pedroza cannot set out a prima facie case of disability discrimination and summary judgment should be granted.

### 3.     Pedroza has not shown that Autozone's explanation for his termination was pretext

#### a.     Autozone has offered a legitimate, non-discriminatory reason for Pedroza's termination

Finally, even if Pedroza had established his prima facie case, he would nevertheless be unable to recover under the ADA because he has not identified any evidence from which a reasonable factfinder could conclude that Autozone discriminated against him on the basis of his disability.  To establish a claim for discrimination under the ADA, absent direct evidence of discrimination, a plaintiff must satisfy the standard of proof set forth for Title VII actions in *McDonnell Douglas*.  *See McDonnell Douglas*, 411 U.S. at 802; *Daigle*,70 F.3d at 396.  Assuming that Pedroza can establish his prima facie case of discrimination, Autozone must produce a legitimate non-discriminatory explanation for his termination.  *McInnis v. Alamo Cmty. College Dist.*, 207 F.3d 276, 280 (5th Cir. 2000).  In order to meet its burden, Autozone must

---

[17]     A disabled employee has no right to a promotion, to choose what job to which he will be assigned, or to receive the same compensation as he received previously. *Allen v. Rapides Parish Sch. Bd.*, 204 F.3d 619, 622-23 (5th Cir. 2000).

provide both "clear and reasonably specific reasons" for its actions.  *Okoye v. Univ. of Tex Houston Health Sci. Ctr.*, 245 F.3d 507, 513 (5th Cir. 2001) (citing *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Autozone maintains that Pedroza was terminated pursuant to a non-discriminatory employment policy by which employees who exceed the one-year limit for leaves of absence are automatically terminated.  Def.'s Reply 5.  During his year of leave, Autozone offered to accommodate Pedroza's restrictions by extending him a position as a part-time CSR.  Def.'s Facts ¶ 29.  Pedroza refused this accommodation, and at the conclusion of a year on leave of absence, Pedroza was still restricted from performing many of the essential functions of an Autozone salesperson.  Pedroza Dep. Ex. 35.  Thereafter, Autozone terminated Pedroza according to its company policy on leaves of absence, which Pedroza acknowledged as having received and read on January 30, 1998.  Def.'s Facts ¶ 9; Pedroza Dep. Ex. 1.

As a general proposition, many district courts in the Fifth Circuit have ruled that an employer's termination of an employee for violation of a neutral attendance policy is legitimate.  *See Smith*, 2007 WL 2851107, at *3; *Roberts v. Mega Life & Health Ins. Co.*, No. 304CV756M, 2005 WL 659026, at *6 (N.D. Tex., March 22, 2005); *see also, Troupe v. Cintas*, No. 99CV0193M, 2000 WL 1056327, at *3 (N.D. Tex. July 31, 2000).  The Court agrees with these other courts and finds that Autozone has met its initial burden of producing a legitimate non-discriminatory reason for Pedroza's termination.

> **b.    Pedroza has failed to demonstrate that his termination was a mere pretext for discrimination**

With Autozone having met its burden of production, Pedroza must demonstrate that

Autozone's allegedly non-discriminatory reason for termination was a mere pretext, and that the underlying reason for termination emanated from his disability.  *See McDonnell Douglas*, 411 U.S. at 802; *Daigle* ,70 F.3d at 396.  Pedroza may prove pretext by "either showing that a discriminatory reason motivated the defendant or by showing that the proffered reason is unworthy of credence."  *Moore v. Eli Lilly & Co.*, 990 F.2d 812, 815 (5th Cir. 1993) (internal citations omitted).  To carry his burden, however, Pedroza "must produce substantial evidence of pretext."  *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 402-03 (5th Cir. 2001).

Pedroza can point to no evidence that indicates a discriminatory intent motivating his termination.  Under the *McDonnell Douglas* framework, once an employer has posited a non-discriminatory reason for termination, the plaintiff bears the burden of responding with evidence that the employer's explanation is a pretext for discrimination.  *McInnis*, 207 F.3d at 280.  Nevertheless, Pedroza points to no specific evidentiary material, either direct or circumstantial, which proves that Autozone treated him any differently than any other Autozone employee who was placed on a one year leave of absence.  Pedroza's bare speculation and subjective belief that Autozone terminated him because of his disability are not sufficient to support a claim for disability discrimination.  *See Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) ("It is more than well-settled that an employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion . . . . ").

Similarly, Pedroza has offered no evidence to support the claim that Autozone's proffered reason for his termination is unworthy of credence.  As defined by the Fifth Circuit, an employer's explanation is "unworthy of credence if it is not the real reason for the employment action."

-33-

*Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 412 (5th Cir. 2007) (citing *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)).  Further, the "[e]vidence that the proffered reason is unworthy of credence must be enough to support a reasonable inference that the proffered reason is false; a mere shadow of doubt is insufficient."  *Auguster*, 249 F.3d at 403.  Pedroza's bald allegations do not support an inference that Autozone's reason for termination was false.  More importantly, Pedroza's assertions, standing on their own, fall far short of the "substantial evidence of pretext" that he must present to survive summary judgment.  *Id.* at 402-03.

Thus, based solely on his subjective beliefs, Pedroza can prove neither that Autozone terminated him with discriminatory intent nor that Autozone's proffered reason is unworthy of credence.  As a result, Pedroza fails to demonstrate that Autozone's allegedly non-discriminatory reason for termination was a mere pretext, and that the underlying reason for termination emanated from his disability.  *See McDonnell Douglas*, 411 U.S. at 802; *Daigle* ,70 F.3d at 396.  Having again failed to meet his burden of production, summary judgment is appropriate.

## III.    CONCLUSION

For the reasons outlined above, Defendant's Motion for Summary Judgment (Doc. No. 39) is hereby **GRANTED.**

Defendant's "Objections to Plaintiff's Appendix to His Response to Defendant's Motion for Summary Judgment" (Doc. No. 43) is hereby **DENIED** as **MOOT**.

**SO ORDERED**.

The Clerk shall close the case.

**SIGNED** on this 4th day of January 2008.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE